IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

_____

**DENISE KOLLMER,**

    **Plaintiff,**

**v.**                                                                                                                              **No. 15-1132**

**JACKSON TENNESSEE HOSPITAL
COMPANY, LLC, d/b/a REGIONAL
HOSPITAL OF JACKSON,**

    **Defendant.**

_____

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
_____

Plaintiff, Denise Kollmer, brought this action against Defendant, Jackson Tennessee Hospital Company, LLC, d/b/a Regional Hospital of Jackson ("Regional"), alleging employment discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et. seq*. (Docket Entry ("D.E.") 1.) Before the Court is Regional's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (D.E. 27.) Plaintiff has filed a response, (D.E. 30), to which Defendant filed a reply, (D.E. 32), and Plaintiff filed a surreply, (D.E. 36), making the motion ripe for disposition.

I.  FACTS

The following relevant facts are undisputed for purposes of summary judgment unless otherwise noted. Kollmer accepted a position with Regional as an Insurance Follow-Up Representative at its Tennessee Revenue Service Center on April 9, 2014. (D.E. 27-1 at PageID

86-87; D.E. 31 at PageID 516.) Plaintiff took a pre-employment drug test, pursuant to Defendant's substance abuse policy, which she passed. (D.E. 27-1 at PageID 88; D.E. 31 at PageID 516.) That drug screen did not test for barbiturates. (D.E. 27-2 at PageID 181; D.E. 31 at PageID 516.) Kollmer was provided with an employee handbook, which included Regional's substance abuse policy and stated that Defendant conducted random drug tests. (D.E. 27-1 at PageID 129; D.E. 31 at PageID 517.) Plaintiff agrees that she received this information but insists that Regional deviated from its stated policy when conducting the drug test that resulted in her termination. (D.E. 31 at PageID 517.)

On a monthly basis, Regional conducted random drug tests to screen for illegal drug use. (D.E. 27-7 at PageID 274; D.E. 31 at PageID 518.) These tests were administered by Cathy Miles, Defendant's employee health nurse. (D.E. 27-7 at PageID 274; D.E. 31 at PageID 518.) On July 29, 2014, Plaintiff was notified that she had been selected for a drug test via a computerized random selection process. (D.E. 27-7 at PageID 274; D.E. 31 at PageID 518-19.) On that same day, Kollmer signed a consent form for the test and was then asked to provide a urine sample. (D.E. 27-1 at PageID 91-92; D.E. 31 at PageID 519.) However, even after drinking fluids over a two-hour period, Plaintiff was unable to urinate. (D.E. 27-1 at PageID 94; D.E. 31 at PageID 519.) Miles told Kollmer that she could come back the next morning to take the drug test. (D.E. 27-1 at PageID 94; D.E. 31 at PageID 519.) Regional's substance abuse policy did not specifically allow for an employee to come back on another day to provide a sample for drug testing, however, Miles was aware that Plaintiff had a bladder issue and thought leniency was appropriate under the circumstances. (D.E. 27-3 at PageID 235; D.E. 31 at PageID 519-20.) Kollmer reported at 7:00 a.m. the next day to take her drug test. (D.E. 27-1 at PageID

2

95; D.E. 31 at PageID 520.) After she was again unable to provide a urine sample, Plaintiff consented to a blood draw. (D.E. 27-1 at PageID 96; D.E. 31 at PageID 520.) Although Kollmer does not dispute that she consented, she nevertheless argues that one cannot consent "to ADA violations," and she contends that the blood draw in this instance violated the federal statute. (D.E. 31 at PageID 520.)

Kollmer's blood sample was sent to MedTox Laboratories ("MedTox") for testing, after which the results were sent to i3screen[1] for review. (D.E. 27-2 at PageID 159; D.E. 31 at PageID 521.) MedTox determined that Plaintiff's blood tested positive for amphetamines, alprazolam, and phenobarbital. (D.E. 27-2 at PageID 164; D.E. 31 at PageID 521.) Also, a small amount of butalbital was found in Kollmer's blood, but it was present in a lower level, below the "cut-off" to qualify as a positive result. (D.E. 27-2 at PageID 167-68; D.E. 31 at PageID 523.) Dr. Janelle Jaworski is a Medical Review Officer ("MRO") who works for i3screen. (D.E. 27-2 at PageID 156; D.E. 31 at PageID 520-21.) Her duties as an MRO include reviewing drug screen results that are submitted to i3screen from outside laboratories, and she was primarily responsible for reviewing the outcome of Plaintiff's test. (D.E. 27-2 at PageID 159-60; D.E. 31 at PageID 521.) After confirming the results transmitted by MedTox, Dr. Jaworski contacted Kollmer to inform her of the positive drug test and ask whether Plaintiff had a medical explanation for the findings. (D.E. 27-2 at PageID 163-64; D.E. 31 at PageID 522.) Upon receiving information from Plaintiff, the MRO confirmed that she had valid prescriptions for amphetamine, alprazolam and Fioricet, which contains butalbital. (D.E. 27-2 at PageID 166; D.E. 31 at PageID 522.) However, she did not have a prescription for medication containing phenobarbital. (D.E. 27-2 at

---

[1] i3screen is a company that contracts with third parties, including Defendant, to perform employment-related drug testing. (D.E. 27-2 at PageID 159; D.E. 31 at PageID 521.)

PageID 166; D.E. 31 at PageID 522.) Based on these facts, Dr. Jaworski changed the test results for amphetamine and alprazolam to negative and verified the test as positive for phenobarbital. (D.E. 27-2 at PageID 167-68; D.E. 31 at PageID 522-23.)

Dr. Jaworski called Miles and told her that Plaintiff's drug test was positive for phenobarbital. (D.E. 27-2 at PageID 170-71; D.E. 31 at PageID 523.) Miles then contacted Barbara Euler, Regional's Human Resources Director, and informed her of Kollmer's test results. (D.E. 27-3 at PageID 239; D.E. 31 at PageID 523.) Euler reviewed Regional's substance abuse policy and determined that the circumstances required termination.[2] (D.E. 27-4 at PageID 261; D.E. 31 at PageID 524.) Euler was solely responsible for making this decision, (D.E. 27-4 at PageID 257; D.E. 31 at PageID 525), and did not have any knowledge of Kollmer's alleged disability at that time (D.E. 27-4 at PageID 252-53; D.E. 31 at PageID 525). Euler informed Cindy Gilmore, interim director of the Tennessee Revenue Service Center, that Plaintiff tested positive for phenobarbital and would need to be fired. (D.E. 27-4 at PageID 255; D.E. 31 at PageID 526.) On August 13, 2014, Gilmore informed Kollmer that her drug test was positive and that she was being discharged effective immediately for violating the substance abuse policy. (D.E. 27-1 at PageID 53-54; D.E. 31 at PageID 526.)

Two days after she was laid off, Plaintiff visited her primary care doctor, Andy Coy, and asked why she had tested positive for phenobarbital, which she contends she never ingested. (D.E. 27-1 at PageID 100; D.E. 31 at PageID 526.) Dr. Coy told her that Fioricet, which contains butalbital, could cause the positive result. (D.E. 27-1 at PageID 101; D.E. 31 at PageID

---

[2] Again, Plaintiff accepts this fact as true but insists that she was subjected to an illegal medical examination, thus making the information obtained as a result thereof illegal and not an adequate basis for terminating her employment. (D.E. 31 at PageID 524.)

526.) Dr. Coy called i3screen and talked to the MRO on call, expressing his opinion about the false positive. (D.E. 27-1 at PageID 103.) The MRO advised Dr. Coy and Plaintiff, who was also on the phone call, that it was not possible for butalbital to test positive as phenobarbital with the testing process employed by MedTox. (D.E. 27-2 at PageID 171-72.) Likewise, with respect to the possibility of butalbital causing a false positive, in her deposition, Dr. Jaworski agreed with the other MRO, stating unequivocally that it "is not possible, absolutely not, with this kind of testing." (D.E. 27-2 at PageID 187; D.E. 31 at PageID 526.) According to Dr. Jaworski, the test used to analyze Kollmer's sample can identify a drug's chemical structures; therefore, even though they are both barbiturates, because butalbital and phenobarbital have different chemical structures, it was not possible for butalbital to test positively as phenobarbital. (D.E. 27-2 at PageID 172-73; D.E. 31 at PageID 527.) Kollmer accepts that Dr. Coy and Dr. Jaworski disagree on this point but disputes the latter's conclusion. (D.E. 31 at PageID 527.) Plaintiff also conceded that she "does not know the 'chemical structures'" of the drugs. (D.E. 31 at PageID 527.)

Kollmer called Miles "not long after" she was terminated to tell her that Dr. Coy told Plaintiff "one of her prescriptions would cause the drug screen to have a false positive." (D.E. 30-4 at PageID 480.) According to Plaintiff, she also informed Miles that she suffered from migraine headaches. (D.E. 30-2 at PageID 359.) Miles informed Kollmer that she could pay to have her specimen retested and that if that result was negative, she would be reinstated, reimbursed for the cost of the retest, and given back pay for any lost wages. (D.E. 30-4 at PageID 480-81.)

Miles's next involvement in Plaintiff's case was a phone call she received directly from Dr. Coy. (D.E. 30-4 at PageID 482.) Dr. Coy told Miles that Kollmer took a medication that would result in a false positive for phenobarbital. (*Id.* at PageID 483.) Miles "told him the same thing she told [Plaintiff]," that the specimen could be retested. (*Id.*) She described Dr. Coy as "frustrated." (*Id.*) Miles called i3screen after this conversation and spoke with the MRO on call about the situation. (*Id.* at PageID 487-88.) She asked the MRO whether "there was any chance that a medication could cause the false positive," and the MRO said there was not. (*Id.* at PageID 488.) Miles said that she did not know of any other reason that Kollmer was terminated other than the positive drug screen. (*Id.* at PageID 491.)

Kollmer elected to proceed with a retest, and after reanalysis, the sample was again verified as positive for phenobarbital. (D.E. 27-2 at PageID 175-76; D.E. 31 at PageID 528.) Regional was notified of this result and Plaintiff's employment was not reinstated. (D.E. 27-4 at PageID 71-72.) Kollmer contends that, although she paid to have a retest of a split sample, the test was improper because the lab retested the same sample that was tested initially. (D.E. 31 at PageID 528.)

## II. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides in pertinent part that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in the nonmoving party's favor. *Ondo v. City of Cleveland*, 795 F.3d 597, 603 (6th Cir. 2015). "There is a genuine issue of material fact only if the evidence is

6

such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) (internal quotation marks omitted). "The test is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* (citing *Anderson*, 477 U.S. at 251-52) (internal quotation marks omitted). The moving party must initially show the absence of a genuine issue of material fact. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). It is then incumbent upon the nonmoving party to "present significant probative evidence to do more than show that there is some metaphysical doubt as to the material facts to defeat the motion." *Id.* (internal quotation marks omitted).

### III. ANALYSIS

A. Illegal Medical Examination

First, the Court addresses Regional's contention that Plaintiff has attempted to add a new claim in her response to the motion for summary judgment. Defendant avers that Plaintiff did not include a claim that she was subjected to an illegal medical examination in her complaint but that she has included that assertion in her responsive pleading. Defendant avers that this contention is not properly before the Court and should not be considered.

In a section of her complaint entitled "Causes of Action Under the ADA," Kollmer alleged that she was discriminated against due to a disability and that Regional denied her the reasonable accommodation of using prescription medication at work. (D.E. 1 at PageID 5.) In the portion of her complaint that provided a factual background, Plaintiff averred that Defendant failed to recognize that the "drug test result was a manifestation of her disability," for which she was terminated, and that "the prescription drug amount[ed] to a 'reasonable accommodation' for

7

her disability." (*Id.* at PageID 4.) She also includes details surrounding the drug test and suggests that Regional did not follow its policy for conducting the reanalysis of her blood sample. (*Id.*) However, at no point does she suggest that the drug test amounted to a medical examination within the meaning of 42 U.S.C. § 12112(d)(4).[3]

Likewise, in her administrative complaint filed with the Equal Employment Opportunity Commission, Kollmer "charge[d] disability discrimination . . . based on actual disability, regarded as disability, or record of disability; as well as failure to allow [her] reasonable accommodation of medication for [her] disability." (D.E. 32-1 at PageID 541.) Although she does mention the drug test when describing her claim, she does not contend that Regional conducted an illegal medical examination. (*Id.*)

However, in her response to the motion for summary judgment, Plaintiff maintains that she was subjected to a medical examination in violation of the ADA. (D.E. 30.) While acknowledging that the ADA explicitly exempts testing for the illegal use of drugs from the definition of medical examination, Kollmer insists that the drug screen she was subjected to was illegal because it tested for both legal and illegal drugs, making it a medical examination within the meaning of the ADA.[4] (*See* D.E. 30 at PageID 323-24; D.E. 36 at PageID 571-72.) Plaintiff

---

[3] 42 U.S.C. § 12112(d)(4) prohibits employers from requiring "a medical examination . . . unless such examination . . . is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12114(d)(1) states that "a test to determine the illegal use of drugs shall not be considered a medical examination."

[4] The Sixth Circuit has recognized that under the ADA's drug testing exemption, the phrase "illegal use of drugs . . . contemplates circumstances where employees abuse medications not prescribed to them." *Bates v. Dura Automotive Systems, Inc.*, 767 F.3d 566, 575 (6th Cir. 2014) (internal quotation and citation omitted). Plaintiff cites to *Bates* in her surreply in support of her position that testing for legal drugs is not permitted under the ADA but fails to mention that the plaintiffs in *Bates* were fired after their employer changed their drug tests to positive with respect to drugs for which they had valid prescriptions. *See Bates*, 767 F.3d at 569, 570-71.

8

contends that "[u]sing illegally obtained results . . . [from the illegal drug test] to terminate [her] unquestionably violates the ADA." (*Id.* at PageID 323.) She further claims that because she was an administrative worker, the medical examination was not "job related and a business necessity." (*Id.* at PageID 323.) Essentially, she argues that Regional had no reason to test her for any prescription drugs, whether validly prescribed or not, because "there is no *conceivable* job-related basis or business necessity for subjecting her to an invasive blood medical examination for [p]henobarbital (a sleep aid)." (*Id.* at PageID 325.)

The Federal Rules of Civil Procedure "provide for liberal notice pleading at the outset of the litigation because '[t]he provisions for discovery are so flexible' that, by the time a case is ready for summary judgment, 'the gravamen of the dispute [has been] brought frankly into the open for inspection by the court.'" *Tucker v. Union of Needletraders, Industrial, and Textile Employees*, 407 F.3d 784, 788 (6th Cir. 2005) (alterations in original) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512-13 (2002)). However, once a case has reached the summary judgment stage, "'the liberal pleading standards under *Swierkiewicz* and [the Federal Rules] are inapplicable.'" *Id.* (alteration in original) (quoting *Gilmour v. Gates, McDonald, & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). In light of these principles, "[a] non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion"; rather, "the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)." *Id.* (citation omitted).

Perhaps anticipating Defendant's argument in this respect, Kollmer's response to the summary judgment motion included a preemptive explanation as to why Defendant should have been on notice of the illegal medical examination claim. Plaintiff argued that "Regional clearly

9

had notice of the drug testing issues . . . " (D.E. 30 at PageID 328), and pointed to the fact that she questioned Euler in her deposition about Regional's substance abuse policy and whether it was adhered to in this case (D.E. 30 at PageID 328). Kollmer characterized her case as an "odd duck," suggesting that "an ADA claim of termination arising out of the drug testing results varies from a typical ADA discrimination claim of termination based upon a disability." (D.E. 30 at PageID 328.) Plaintiff further averred that the "short and plain" notice standard applied, stating that her complaint indicated her "surprise" that her drug test was positive for phenobarbital because "she did not know [that drug] was to be tested"[5] and she had not taken phenobarbital. (D.E. 30 at PageID 328.)

After a careful review of Plaintiff's complaint and comparison to her summary judgment response, the Court agrees with Defendant that Kollmer attempted to add a new claim in her response. Merely recounting the factual background of her case, which included the details surrounding the drug test, does not amount to stating a claim that she was subjected to an illegal medical examination. And, as previously discussed, the short and plain notice standard is not applicable at the summary judgment stage. At most, Kollmer's complaint included an assertion that Regional did not follow its substance abuse policy, in particular with respect to the second test of her sample. But, even construing her complaint generously, there is nothing to suggest that she was proceeding under a theory that the initial drug test was a medical examination.

Further, Plaintiff's attempt to cast her illegal medical examination claim as simply "odd" in contrast to a more typical claim of termination based on disability is unconvincing. The gravamen of Plaintiff's complaint is that Regional fired her because it learned of her migraine

---

[5] The complaint does not contain a statement that Kollmer was unaware she would be tested for phenobarbital. (*See* D.E. 1.)

headaches after the alleged false positive drug test and failed to accommodate her by allowing her to take prescription medication. In contrast, medical examinations are prohibited by the ADA for all employees, "regardless of whether they have a qualifying disability." *See Bates*, 767 F.3d at 573; 42 U.S.C. § 12112(d)(4).

Plaintiff also suggests that Defendant should have known she intended to proceed under this theory based on questions asked during Euler's deposition about whether Regional's drug testing policies were followed in this case. But, if Kollmer thought she had discovered evidence that would support an additional claim during discovery, she should have amended her complaint in accordance with Federal Rule of Civil Procedure 15(a). Her attempt to do so in response to a summary judgment motion is improper. *See Tucker*, 407 F.3d at 788; *Desparois v. Perrysburg Exempted Vill. Sch. Dist.*, 455 F. App'x 659, 666 (6th Cir. 2012) ("[A] plaintiff may not expand [her] claims to assert new theories for the first time in response to a summary judgment motion.") (citations omitted). Consequently, the Court will not give this claim further consideration and now turns to the two claims raised in Kollmer's complaint: that she was terminated based on her disability and that Regional failed to accommodate her by allowing her to take medication for her migraine headaches.

B. <u>Wrongful Termination and Failure to Accommodate</u>

Defendant contends that it is entitled to summary judgment because there is no genuine dispute with respect to Regional's knowledge of Plaintiff's alleged disability. Specifically, Defendant avers that Euler, who was the sole-decision maker with respect to terminating Kollmer, did not know that she suffered from any disability while employed by Defendant.

11

Regional argues that this undisputed fact is fatal to both of Plaintiff's disability discrimination claims. Plaintiff has not pointed to any evidence in the record to counter this argument.

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A plaintiff in an ADA suit may prove discrimination with either direct or indirect evidence. Kollmer has not offered any direct evidence that Regional terminated her based on her disability, so the Court will analyze this claim under the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) burden-shifting framework. *See Stansberry v. Air Wis. Airlines Corp.*, 651 F.3d 482, 487 (6th Cir. 2011).

To establish a prima facie case of discrimination using indirect evidence, an employee must show that there is a genuine issue of material fact regarding each of the following elements: "(1) she was 'disabled' under the ADA; (2) she was otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations; (3) she suffered an adverse employment action; (4) *the employer knew or had reason to know of the plaintiff's disability*; and (5) a nondisabled person replaced her." *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 (6th Cir. 2008) (emphasis added). The plaintiff's disability must be a "but for" cause of the adverse employment action. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc).

If the employee makes out a prima facie case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Nance*,

527 F.3d at 553. "If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id.* Under *McDonnell Douglas*, the burdens of production shift, but the "'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* at 553-54 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). For purposes of a motion for summary judgment, the Court must consider "whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Id.* at 554 (internal quotation omitted).

Similarly, to establish a prima facie case of disability discrimination based on a failure to accommodate, a plaintiff must show that: (1) she is a person with a disability within the meaning of the ADA; (2) she is otherwise qualified to perform the essential functions of her job; (3) *her employer knew about the disability*; and (4) the employer did not provide a reasonable and necessary accommodation for her disability. *Smith v. Ameritech*, 129 F.3d 857, 866 (6th Cir. 1997) (emphasis added). If the plaintiff makes a prima facie case, "the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated, because the accommodation would impose an undue hardship on the operations of its programs." *Gaines v. Runyon*, 107 F.3d 1171, 1175-76 (6th Cir. 1997). It is not necessary to address the question of reasonable accommodation where a plaintiff fails to establish a prima facie case. *Id.* at 1176.

In a case strikingly similar to the one at hand, the Sixth Circuit rejected a plaintiff's claim that he was fired for a manifestation of his disability resulting from a false positive on a drug test. *See Bailey v. Real Time Staffing Servs., Inc.*, 543 F. App'x 520 (6th Cir. 2013). In that case, the HIV-positive plaintiff alleged that a validly prescribed medication caused a false

13

positive for marijuana on a drug screen. *Id.* at 521. On the same day he received the positive test results, the plaintiff obtained a doctor's note explaining that he took a drug that could cause a positive result on a drug test. *Id.* Bailey's employer instructed him to give this information to the MRO. *Id.* at 522. When the plaintiff contacted the MRO, he was told that the positive test result would stand. *Id.* The defendant consulted with the MRO and then fired Bailey for failing the drug test. *Id.* Bailey never told anyone at Real Time Staffing that he had HIV, only that he suffered from a "medical condition." *Id.*

In the district court, the plaintiff argued that "[t]he false positive [wa]s a clear manifestation of [his] disability and the mitigating measure of medications taken for his disability." *Bailey*, 543 F. App'x at 522. The court rejected that argument and granted summary judgment for Real Time Staffing. *Id.* at 522-23. The Sixth Circuit upheld that decision on appeal, reasoning that the defendant "could not have fired Bailey because of his HIV because it simply did not know he had HIV. Nor are there facts in the record to suggest Real Time fired him for some unspecified, perceived impairment rather than the positive drug test." *Id.* at 524. The court stated that the plaintiff could not "show pretext if Real Time had an honest belief that he used illegal drugs—that is, if it made a reasonably informed decision before firing [him] and if its deliberation was not marred by 'an error too obvious to be unintentional.'" *Id.* (citing *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 705 (6th Cir. 2013)). Furthermore, the court held that "[e]ven if the positive result was in fact false, an employer's reliance on an erroneous result does not create a claim under the ADA absent an independent showing that the real reason for the firing was a disability." *Id.*

Kollmer protests that *Bailey* is inapplicable because it was about "[e]mployee privacy in cases involving stigmatic medical conditions like HIV." (D.E. 30 at PageID 329.) She argues that *Bailey* is distinguishable because it "never involved an illegal drug examination on the front end, or fruit of such poisonous tree on the back end." (*Id.* at PageID 330.) The Court disagrees, and finds that the reasoning employed in *Bailey* is highly probative of the issues presented in this case.

The record shows that Kollmer tested positive for phenobarbital, a controlled substance for which Dr. Jaworski confirmed she did not have a prescription. (D.E. 27-2 at PageID 164, 166.) Dr. Jaworski contacted Miles to inform her that Plaintiff's drug test was positive for phenobarbital, (D.E. 27-2 at PageID 170-71), and Miles reported this to Euler (D.E. 27-3 at PageID 239). Euler then unilaterally made the decision to terminate Kollmer based on the violation of Defendant's substance abuse policy. (D.E. 27-4 at PageID 257.) At the time this decision was made, Euler was unaware that Plaintiff had any disability. (*Id.* at PageID 252-53.) Although Plaintiff has suggested that Miles "upon whom [Euler] relied" knew she had a disability, (D.E. 31 at PageID 525), Kollmer stated in her deposition that she did not tell Miles about her migraines or prescription for Fioricet until after her appointment with Dr. Coy, which took place two days after she was fired (D.E. 30-2 at PageID 359). Further, after Miles received a call from Dr. Coy, who stated his belief that the drug test result was erroneous, Miles called i3screen to inquire about the possibility of a false positive. (D.E. 30-4 at PageID 487-88.) The MRO at i3screen told Miles that it was not possible for butalbital to show up as phenobarbital given the type of testing utilized by MedTox. (D.E. 27-2 at PageID 172.)

Defendant's decision to credit the MRO's opinion over that of Plaintiff and her doctor "does not support an inference of discriminatory animus." *See Bailey*, 543 F. App'x at 524. Moreover, these conversations occurred *after* the decision to terminate was made. Thus, Regional could not have fired Kollmer because of her migraine headaches because it did not know about that condition or that she was taking Fioricet at the time the adverse employment decision was made. Defendant acted with due diligence in following up with the MRO after Plaintiff and her doctor opined that her legal prescription caused the false positive. In sum, even if the results of the drug test were incorrect, Regional's reliance on these results does not constitute a claim under the ADA because there is no evidence that the actual reason for termination was Plaintiff's alleged disability. *See Bailey*, 543 F. App'x at 524. Because Kollmer has not shown that Defendant had knowledge of her disability prior to termination, she cannot make out a prima facie case of disability discrimination. Therefore, Regional's motion for summary judgment on this claim is GRANTED.

The same result is compelled with respect to Plaintiff's failure to accommodate claim. Again, a prima facie case requires a showing that the employer knew of the employee's disability, but Kollmer has not produced any evidence that Euler, or anyone else at Regional, knew of her migraine headaches during her employment with Defendant. Accordingly, Regional's motion for summary judgment on this ground is GRANTED.

## IV. CONCLUSION

In light of the foregoing and the record as a whole, Defendant's motion for summary judgment is GRANTED, and this case is DISMISSED with prejudice.

**IT IS SO ORDERED** this 9th day of November 2016.

s/ J. DANIEL BREEN<br>CHIEF UNITED STATES DISTRICT JUDGE